May it please the Court, Robert Keech, for the appellant Joe Whatley and the appellee on the cross-appeal, Joe Whatley, as the WD trustee for the so-called WD Trust formed under the confirmed plan of Montreal-Maine Atlantic Railway. With leave of court, I'd like to reserve five minutes for rebuttal, if I could. You'll have to watch that yourself. I will. Thank you. Very well. The district court committed reversible error in sua sponte granting summary judgment, limiting the recoverable damages to the value of the crude oil originally on the train involved in the infamous Lac-Megantic derailment for two reasons. One, doing so violated Rule 56-F and basic principles of fairness and due process. And two, because the scope of damage standard that the district court penned for the first time is contrary to binding U.S. Supreme Court precedent and the precedent of this Court that unquestionably allows recovery under the Carmack Amendment of all reasonably foreseeable damages. And further, that the issue of foreseeability is an issue of fact for the jury. The district court's invented standard ignores the reality of this case, i.e., that CP actually foresaw the damages sought and their magnitude, major environmental and third-party harm, and attempted to negotiate a limitation of liabilities with world fuels, the asinore of these causes of action, but failed to do so. But even if the district court standard was not in defiance of the Supreme Court standard for Carmack Amendment damages, it was misapplied by the district court here, in that all of the damages claimed by world fuels, the asinore to Watley, are inextricably linked to the which form a part of the damage demand in this case. World fuels' liability for environmental damage in Canada, for example, was solely as a consequence of the fact that it owned the oil. Counsel, what is the effect of the opinion we got in French? High school French failed me on that, looking at it, but what's the effect of that on this case? Fortunately for the panel, Your Honor, it has absolutely no effect on this case. It's completely irrelevant. Completely? Completely irrelevant. Go ahead. And I can summarize why it's completely irrelevant pretty succinctly. This case is about quasi-strict liability under the Carmack Amendment. The Canadian opinion was a negligence case right under Canadian law under completely different principles with, frankly, different parties. But as was established in this case, CP's negligence or lack thereof is not relevant only, or was relevant only in one sense, and that is it had to prove in this case that world fuels, as the shipper, was completely responsible for what occurred here. And of course, the finding below was that world fuels had no responsibility whatsoever for the derailment. And that fact doomed CP to its quasi-strict liability. But the Canadian negligence judgment has no impact on this case. I'm frankly not at all sure why they bothered to bring it to the Court's attention. It's probably not a proper use of that rule, but because it means nothing, we're not objecting to it. Pursuant to this circuit's opinion in Caspi, I hope I'm pronouncing that right, the Carmack not so remote as to make them unforeseeable to a reasonable man at the time of contracting. That standard is critically important in this case, because at the time of contracting, the evidence that we brought before the Court below proves that CP completely foresaw the nature of these damages and their potential magnitude. They were trying desperately to negotiate an agreement with world fuels to limit that  They allowed the fateful train to leave and progress towards its Canadian destination, notwithstanding never having reached such an agreement, and instead allowed the bill of lading and a short tariff to govern the trip. Neither of those documents, as the Court found below, limited liability. So, what we have here is full Carmack damages, and full Carmack damages, as this Court has ruled on at least two occasions, means all damages reasonably foreseeable at the time of contracting. But not to third parties, right? Fergin case. Yeah. If a party who's not a party to the bill of lading, a true third party, is raising personal injury claims, what Fergin says is that's completely outside the Carmack Amendment. Fergin's not a case on the scope of Carmack damages. In fact, to the extent it says anything about the scope of Carmack damages, it's agreeable with the broad standard I just articulated. But what Fergin simply says is that a party who's not a party to the bill of lading is not bringing a case under the Carmack Amendment. That case wasn't about a shipment of goods, right? The shipment had been completed before the injury occurred. And there's not a line in the case that speaks to the scope of Carmack damages, other than if you look at the reasoning, again, the court is in full agreement with the Southeast standard I just quoted from the Supreme Court. It quotes that standard. More importantly, the court actually discusses circuit court cases where when the shipper is bringing the claim, the shipper has a means of recovering intentional infliction of emotional distress damages under Carmack under the right set of circumstances. So clearly, it recognizes that Carmack damages are not limited to injury to the lading, that you can recover other consequential damages, consistent with what the Supreme Court has said since 1916. The – I don't want to tarry too long on the Rule 56-F issue, but briefly, as the court is well aware, having decided this issue three times, the district court has the power to enter summary judgment to esponte, but only if the losing party was given notice of its intent to so rule and is given an opportunity to come forward with all of its evidence. Didn't CP raise the scope of damages issue in its motion for summary judgment? Didn't that put you on notice? It did not raise the issue in the renewed motion for summary judgment, and one needs to recognize the somewhat tortured procedural history here, but this issue was ruled upon and the court found that the scope of damages and the issue of foreseeability was an issue for the jury for trial, it was specifically reserved for trial. If you fast forward, when the new judge was appointed, he did allow the parties to renew summary judgment on three distinct issues, and only those three issues, none of those issues invokes anything about the scope of Carmack damages, including the argument around collateral source. CP has essentially tried to backfill by saying that the collateral source argument raised the issue of actual harm. It does no such thing, at least not actual harm in the sense of the words in the Carmack amendment. What they were talking about there was that the argument that because World Fuels had received insurance payments, that those insurance payments meant that it no longer had any harm because it had been paid. And they're combining that with their argument not supported by any authority and contradicted by all the authority, that the collateral source rule doesn't apply in a Carmack amendment case. But their use of the words actual harm in that discussion had nothing to do with Carmack scope of damages, it had to do with insurance payments. So the short answer is it wasn't raised even collaterally in any of those three arguments with respect to the summary judgment motion. As far as we knew, the issue was still reserved for trial. It wasn't part of any of the three issues that were specifically briefed. CP didn't brief the issue in any of its briefing on those three issues. And frankly, we were shocked when the court decided, contrary to its earlier ruling, to decide it. That's the very antithesis of Rule 56F. I mean, we've been litigating this case for a decade. We have hundreds of pages that prove that CP foresaw this actual event in so many words. And trust me, if we had any hint whatsoever we needed to put that evidence before the court, we would have delivered the 600 pages in a wheelbarrow. There was no hint that the court was going to decide this issue, not even a little. That's one of the reasons we reacted so quickly with the motion for reconsideration, which the court essentially denied, I think, inside of 24 hours while acknowledging it hadn't read any of the evidence we put in front of it. So we think this is about as clear a violation of 56F and due process as you can get. I think it's a reversible error under Montgomery and Maraca and Heisler, three decisions of this court. In fact, I think the facts in this case, I think, are much worse than the facts in that case. And I think this case also illustrates the reason why 56F exists, which is one would hope that if we'd been able to brief this issue before the court decided to decide it on its own, that we could have informed the court about this circuit's binding authority and the Supreme Court's binding authority on scope of damages. And it's difficult, frankly, to articulate precisely the rule that the district court decided on below. But it seems to have two elements. One is that there are whole categories of damages that are not foreseeable as a matter of law. And it's hard to actually say that phrase without it contradicting itself, right? Because foreseeability is always a question of fact. But... Well, not always. It can be so clear, counsel. Go ahead.  And honestly... You like the always. Go ahead. Sure. Fair point, and I stand corrected. In fact, we think actually it's so clearly foreseeable in this case that we maybe should have moved for summary judgment on it, but we do think it was a question for the jury. We still think it's a question for the jury. But it's clearly the case that it's not that there are certain things that are just never foreseeable. And in this case, that concept defies reality. These were actually foreseen, actually negotiated. CP doesn't dispute that the quote that we put in the brief of the parties negotiating over why they needed a limitation of liability is accurate. And the reason CP wanted a limitation of liability is because the nature of the product here, right, the nature of the lading in this case is that it was inherently dangerous, inherently explosive, and then if you put that together with the fact that it was being transported in cars that were known to breach and cause explosions, you have foreseeability. And that's the evidence that would have gone in front of the jury. That's the evidence we put forward on the motion for reconsideration. The other aspect of the test that the district court developed below was, well, even if, and it seems to almost be presented in an even if fashion, well, even if there aren't whole categories of damages which are not foreseeable as a matter of law, which again I think is kind of an absurd concept, his argument, his test is the damages have to be somehow tied to the lading or tied to the damage to the lading. And he finds that's not true here. Frankly, that baffles me more than the first because every single aspect of the damages here is tied to the lading. I mean, the simplest, forget about his sort of description of, and look, it was spectacularly and spectacularly tragic. There was an explosion, there was a 150-foot fireball, and there was a big fire. But you can even put that completely out of the picture. You had a 72-car unit train, every car filled to the brim with crude oil that derailed in a town sitting next to a lake with a river flowing into the lake. That lake was contaminated, that river was contaminated, the soil was contaminated to the point that they had to take the first several feet of topsoil and move it. If you just think about environmental damages, which is actually specifically mentioned in the quote when they're negotiating with one another, the environmental damages in this case were a multiple of what World Fuels paid in settlement. And World Fuels was liable in Canada for environmental damages because they owned the lading. Nothing else needed to be proven. And so it's clear that doing business in Canada, they would have known that, CEP would have known that. They would have anticipated that environmental damage here would have resulted in liability to their shipper, and that their shipper would settle with the environmental authorities. Half of the money of the settlement fund that runs through the Canadian plan goes to governmental entities for environmental remediation claims, actually slightly more than half. So it seems pretty clear that this was a damage that was foreseen. So with respect to where we think this case should go from here, we think the path is pretty clear. We think this foreseeability of damages and the amount of damages, and specifically whether the settlements were foreseeable, is an issue for the jury. This judge took this case away from the jury, it should go back to the jury, and it should go back to the jury, I think, with clear instructions from this court that the damages standard articulated in CASB is still good law, it's consistent with the Supreme Court authority on the point, and that the instructions to the jury have to be consistent with CASB and the Supreme Court. And with that, I see I'm down to my five minutes, and I'll try to preserve those, unless the court has questions. Hearing none, very well. Thank you, Your Honor. Thank you, Your Honor. Good morning, may it please the court. My name is Paul Hemming. I represent Appalese and Cross Appellants, who are referred to in this case as Canadian Pacific, collectively, or CP. CP was without fault for the derailment. The derailment was caused entirely by the negligent actions of an on-the-railroad MMA. That finding by the district court, which is not challenged here, combined with the judgment reduction provisions of MMA's bankruptcy plan and confirmation order, mandates that any judgment here against CP be reduced to zero. I'll give a brief background, walk through several of the applicable judgment reduction provisions, speak briefly on tariffs, and then conclude by addressing some other arguments, including collateral source, and things Mr. Chief. Well, do you want to address the summary judgment point first? Sure. Because we don't get to anything else, right? Yeah, happy to. Rule 56F, which is invoked by Mr. Keech, first we have a few reasons why his argument as to procedural error should be rejected. He had argued no less than three times, citing the same case, always southeastern, in three separate rounds of briefing before the district court. This wasn't a matter of surprise. I would point the court to Whatley's response brief at page 61, where he says, our contribution and indemnity arguments, that these claims for these settlement amounts are really just contribution and indemnity claims, disguised as CARMAC. He said that's just another way of arguing the scope of CARMAC damages, which is the issue he is claiming surprise about. This is an argument that the district court very succinctly categorized as borderline frivolous. As to the scope, we've heard some discussion of Ferguson. Ferguson is the most on-point case. It actually cites the Supreme Court precedent in the southeastern case. It does not impose a foreseeability standard, and in fact, it reads the portion of southeastern that Mr. Keech relies upon for broad CARMAC scope of damages. What about the Caspi case? What's his name? The Caspi case, I don't think, helps him here, particularly with regard to the third-party settlements. In Caspi, at issue there was some accounting records, which were either lost or destroyed in an accident, so the cost to recreate those accounting records, I believe the court said was foreseeable. You lose the records, you need to recreate them. That is like a lading loss. I don't think the Caspi case gets him anywhere. What about the fact that Caspi cites a whole line of Fifth Circuit cases, and they're the toughest on this, the Fifth Circuit? I don't think the Fifth Circuit imposes any broad foreseeability standard, like what Mr. Keech is advocating, that would include settlements that an entity like World Fuels voluntarily settles to cover its own tort liability. None of those cases that he cited support that sort of broad scope of CARMAC liability, which is really the amendment is to have some predictability that the carriers can rely upon, and that was the exchange when the amendment was created to make carriers responsible for lading losses caused by other common carriers, in this instance, MMA. Well, the Fifth Circuit is the most reasonably foreseeable circuit, apparently, on this issue. I would point out that the A Circuit is not. Well, we said Caspi cites and references Hector, the Fifth Circuit case. Yeah. I still don't think the standard is that broad where you could hoist settlement payments upon a carrier that is viewed as innocent, which CP should be here, given it had no causal role in the derailment. As to the foreseeability, Mr. Keech says it's a question of fact. I would disagree with that. We have representations from Mr. Keech in related litigation in Maine that said no one could have foresaw the bizarre circumstances of this derailment. So many things had happened to cause this derailment that nobody could have foreseen it. If you take it one step further on that analysis, we have here a shipper, World Fuel, who settled for over $100 million U.S. when apparently they had no actual liability, at least as to causation for the derailment. Whatever acts World Fuel did in misclassification of the oil, Judge Wilson deemed to be not causally related to the derailment, which was 100% the fault of MMA. As a brief background, in the derailment's wake, dozens of lawsuits were filed in the U.S. and Canada against many parties. All parties except CP settled in the bankruptcy and settlement funds were distributed to MMA's derailment victims. The shipper voluntarily settled all third-party damage and injury claims asserted against it for over $100 million U.S. Per the complaint, these settlements relieved World Fuel of over $1 billion in potential liability for its alleged torch, which Mr. Keech referenced in the environmental cleanup actions in Canada, in which, as a relevant segue, the Friedland case rejects those sorts of losses when they're covered by insurance, which we talk about in our brief Friedland case. In the settlement with the then-bankruptcy trustee Mr. Keech, counsel here, the shipper as part of the agreement assigned any claims it possessed under the CARMAC to Mr. Keech. Mr. Keech subsequently assigned them to the plaintiff here, Wattley, another trustee. In the settlement, World Fuel released any claims it possessed against MMA, including any and all claims against MMA under the CARMAC amendment. It could have sued MMA under the CARMAC amendment for these same losses that they're alleging here, but it didn't. Now, the bankruptcy estate seeks to double up on the over $100 million U.S. settlement payments it already received from World Fuel's insurers by characterizing those payments as CARMAC damages. Viewing World Fuel as the plaintiff here helps illustrate the problem with this case. World Fuel would be in the incredible position if one indulged their claim of making over $100 million as a result of the derailment. Equally incredible, the more World Fuel voluntarily agreed to pay in settlements or have its insurers pay in settlements, the more it could claim here as supposed CARMAC damages. As mentioned, CP was the only defendant that didn't settle in MMA's bankruptcy case. CP had long objected to the initially proposed plan because it purported to eliminate CP's contribution and indemnity rights against parties at fault for the derailment without any express judgment reduction provision. Under the plan, CP claims against MMA and others, including its express statutory right against MMA for indemnity under the CARMAC amendment, were extinguished. CP removed its objection when, in exchange for the loss of rights, judgment reduction provisions benefiting CP were included in the plan. These provisions provide CP, among other things, a judgment reduction based on the proportionate fault of MMA when MMA has settled with the party suing CP. Here that would be World Fuel's. Because resolution of the judgment reduction issue moots every other issue in this case, I'll address that first. The district court incorrectly viewed application of these provisions as a question of one judicial order is binding on another court. Application of these provisions is a matter of contract interpretation. That's not disputed here and there's no claim of ambiguity. This is consistent with the prior A Circuit panel's direction to the district court that on remand it had to review and apply as necessary tolling provisions contained in MMA's plan to determine if the CARMAC claim assigned to Watley by another entity, Irving Oil, was timely. That claim is no longer part of the case, they were dismissed, but the district court was still required to review and interpret plan provisions. The task here is really no different. In each instance, all that really is required is to review and construe the contractual terms in MMA's bankruptcy plan, paragraph 64 of the confirmation order. As the case stands now, don't you still have that argument before the bankruptcy court available to you? I believe it should have been determined by the district court in the first instance. I understand that. Yeah. There is a relief valve that says that issue, if the proper trial court fails to address it, provides a safety valve. But it's incredible to believe that that sort of... As it stands now, you still have the ability to go before the bankruptcy court and make this argument, right? We could raise the argument before the bankruptcy court in the event that the district court and this court do not construe it. However, we believe as a matter of contract application, the district court was required to construe it and it should be construed here. The applicable credit in this case is contained... You said that the judgment reduction provision issue moots every other issue in the case? That's correct. So, if the court were to agree with that, what would an order from this court look like? Would it be a remand to the district court to now consider the JRP and to interpret it and apply it? It wouldn't be a remand to the district court because these are questions of law. This court, the circuit has discretion to decide this on its own. It's been briefed twice extensively in the district court. It's had two opportunities to do this. I would ask that this court consider the argument. It doesn't involve application of fact-finding duties or anything like that. It's a matter of contract interpretation. If it was remanded to the district court and either side was dissatisfied with the opinion, which is likely, it comes back to this court under de novo review. So, I think there's a strong judicial efficiency argument for this court. But you follow what I'm saying? Up to this point, no one, no court has actually interpreted that provision. No, I would disagree with that, Your Honor, because Judge Levy in Maine back in 2016, we had all sorts of arguments about whether these various tort cases that were asserted against CP in Maine, or excuse me, in Maine and Illinois and Texas ought to be transferred under bankruptcy related to jurisdiction to Maine. And the plaintiffs in that case, which included Mr. Keech as well as a number of tort plaintiffs, successfully argued that because there is this very judgment reduction provision plan, which invokes Austin, CP was and is going to put MMA's comparative fault at issue in the derailment. And because of that, because there was going to be discovery against MMA, bankruptcy estate assets were going to be depleted. And the whole basis for the transfer in jurisdiction of all these cases to Maine was because Judge Levy accepted that argument that MMA was going to be the target of discovery. It was going to have to respond to this stuff. CP was going to prove its fault. And because of that, the estate funds would be lessened. And Judge Levy, in his order, said exactly what we say in our briefs. We have the benefit of these judgment reduction provisions, and they're quoted in a number of places in our brief. And in fact, Mr. Keech, counsel here, was one of the advocates for the fact that these judgment reduction provisions and CP putting the comparative fault of MMA at issue was going to affect the bankruptcy estate. That was the basis for jurisdiction on the transfer. So that's not a item that Mr. Keech classifies as dicta. That was a finding Judge Levy made based on the arguments presented before him. The applicable credit, as I mentioned in this case, is in paragraph 64C. It's the contribution indemnity credit because CP possessed an absolute and direct right of indemnification against MMA under the Carmack Amendment. In this case, Plaintiff Whatley stands in the shoes of WorldFuel. WorldFuel, as I mentioned, settled and released all Carmack claims. And under Austin, in numerous cases applying common law principles, including the McDermott case, when a plaintiff settles, like the Austin plaintiffs did with John's Manville, the non-settling party's direct contribution or indemnity rights have been extinguished. The plaintiff's recovery is reduced by the proportionate share of the settling party's fault. Here, the proportionate share of the settling party's fault is 100%. John's Manville, that portion of the Austin decision, is what is key here. And it's key here because we have an underlying plaintiff, WorldFuel, that settled with MMA. Mr. Keech advocates that the UNARCO portion of the Austin decision should be what's followed. That's not the case. UNARCO was a party that didn't settle. And I would direct the court's attention to footnote 16 in the Austin decision, which provides a distinction with how to treat a settling party versus a non-settling party. With respect to CP's tariffs, they also work to limit CP's liability and can end this case. It's another issue that, like judgment reduction, can absolve and stop this case. To limit liability, a carrier is required to offer a shipper a choice between full CARMAC liability and restricted liability. As the district court found, the parties do not dispute that CP offered WorldFuel a reasonable opportunity to choose its preferred level of liability. Under the CARMAC amendment, a rail carrier limits its liability by written declaration of the shipper or by a written agreement. Any formulation of the test, and there are a number, to limit carrier liability at bottom come down to whether the shipper is given a choice to select full CARMAC liability versus something less. The evidence here overwhelmingly reflects the shipper's decision that CP's liability was limited by Tariff 1 under any test. The appeal in this regard really centers around CP's evidence reflecting the shipper choice and the lack of evidence from WorldFuel or Whatley on this point. First, we have pre-derailment acknowledgement of the shipper's choice and applicability of Tariff 1 by email chain in early 2013. We've included a summary of the chart outlining all the evidence I'll mention in our addendum. In this main correspondence, CP even reminded WorldFuel how it could select full CARMAC liability if it so chose. Second, we have the online bill of lading entry process and the resulting printed bill of lading. CP's evidence on this point was not contested. To get through the process, the shipper was required to electronically click on and accept CP's terms and conditions, which provided web links to including Tariff 1. Whatley acknowledges the process was conducted online in paragraph 31 of his complaint. And while he alleged in that same paragraph this web link was not working or offered no evidence of a limitation liability, there is zero evidence in the record reflecting that allegation. It's also not contested that CP's tariffs were publicly available and actually possessed by WorldFuel, as Tariff 1 was emailed internally among a large group of WorldFuel employees immediately after the derailment. The same Tariff 1 was also referenced in pre-derailment exchanges, providing a web link to Tariff 1 with instructions on how the shipper, the gentleman's name was Carlos Cuervos, could obtain full CARMAC liability if it so chose. Given those things, Whatley's unsupported broken link allegation in paragraph 31, even if that were true, it would be immaterial because the shipper here, WorldFuel, had actual possession of Tariff 1. It's as though the district court found this broken link, this broken web link allegation, proven by Whatley without evidence supporting the allegation. But there was a lot of evidence about negotiations going on at the time. There were. There was a lot of evidence. Tons of evidence on negotiations. In fact, when the prior contract, prior private commercial agreement had expired in July of 2012, there was a year-long process. And Mr. Keech mentions the reason for this is because CP had some concern that it might be held to a claim like what he's asserting. But that's not true. The old expired contract had a per-car limitation of $50,000 per carload in this privately negotiated commercial agreement that had expired. Back at the time, the value of Bakken Oil was skyrocketing to the point where the actual value of a crude oil in any given tank car was in excess of that. So that's the reason behind the negotiation of some sort of new agreement and why WorldFuel desired the liability limitation be increased. Ultimately, until they could come to a new complete agreement, which they never did, they had this interim agreement to operate under CP's tariffs and a pricing authority we call Limited Distribution Tariff 2248 in the interim. We also have immediate post-derailment internal concessions and explanations that. Counsel, before your case, before your time's up, do you have a comment on the Canadian case you sent us in French? Yes, absolutely. I will be submitting. It's relevant for a number of reasons. It's persuasive. Address the issue, not the comedy. One, the underlying district court opinion, which was affirmed on appeal, and I can't read it yet either, found CP's tariffs applied to the movement in question, train 282. So we think that's persuasive, that the Canadian court construed what the terms and conditions were applicable to the train movement, and it said tariff one applies. We'll submit the decision as translated as soon as we receive it approximately this week or next. There's also a number of other persuasive points in the Canadian decision, including on foreseeability, that this sort of loss is something that CP wouldn't foresee, and it also references a number of points that confirm district court judges' opinion that MMA was 100 percent at fault for the derailment. So if you're getting into the comparative fault analysis under Austin, it supports Judge Wilson's finding. I see that I'm out of time, unless the panel has any other questions. Hearing none, thank you, Mr. Hamming. Mr. Keech, your rebuttal. Thank you, Your Honor. Let me first very quickly dispose of the issue of the judgment reduction provision. What's important to note is the record clearly establishes that CP doesn't disagree, but CP consented to the plan of liquidation in the MMA Chapter 11 case and to the terms of the confirmation order. That plan provides that if the trial court demurs on applying the judgment reduction provision, the parties agree that the matter goes back to the Maine Bankruptcy Court. That's a matter of contract. There is no contract-based argument under which this Court gets to decide that question. There is a clear contractual agreement by CP that if the trial court demurs, it goes to Maine. But didn't the stipulation that was entered and accepted in full by the district court, didn't that provide that the district court would determine this issue? Well, we agreed, the two of us agreed, that the district court could do it, because clearly under the plan, the first step under the plan is the trial court will do it. But if the trial court demurs, I mean, the parties specifically contemplated, just like they contemplated all the damages here, we specifically contemplated that we might run into a trial court who would simply not be comfortable doing it. And in that case, we provided a default mechanism. It goes back to the Maine Bankruptcy Court. And that's what the parties agreed would happen. And what CP is doing here is simply reneging on its agreement and trying to get this court to decide the issue. And frankly, the entire issue is a Hail Mary being thrown to the wrong receiver and not landing anyway, right? Because the judgment reduction provision, which I happily drafted, doesn't apply to this Carmack case at all. It gives them no relief whatsoever. There's not even a good faith argument that it gives them relief for a couple of really simple reasons. One is the judgment reduction provision provides in multiple places in the plan and in the order that the liability of MMA gets 100 percent allocated to the other liable parties in the case. In the Carmack case, there's only one liable party. It's them. So if you apply the judgment reduction provision, all of MMA's liability gets allocated to CP, and that's the end of the application of the provision. And the reason for that, and this is classic in these provisions. This one's no different. When you have insolvent parties in a judgment reduction context, right, and you have solvent defendants, and you put in place settlement bar orders, the reason you give judgment reduction to the non-settling parties is because they don't have the ability to pursue indemnity claims against other solvent defendants. They don't get reduction because they can't chase the insolvents. The reason they can't collect from the insolvents is because they have no money, not because they're barred by the order. And so these provisions always reallocate the insolvent party's liabilities to the other solvent responsible parties. That's what happened here. You only get to Austin under this provision to determine how to do that allocation among responsible parties. But here it's really simple. You don't have to choose how you're going to allocate it. You just allocate it all to them. With respect to this offhand reference to Judge Levy, Judge Levy, the United States District Judge in Maine, never decided this issue. He did not have the issue of the judgment reduction provision in front of him. By the way, that entire colloquy conflated about three years' worth of time. Judge Levy had nothing to do with the transfer of the cases to Maine. That was a different judge. It happened years before Judge Levy ever got the issue in front of him. The offhand mention of this by Judge Levy was in a case where he transferred a post-confirmation tort claim to another place. So the factual context was all wrong, but the reference to Judge Levy was also all wrong. But the JRP just has, it doesn't, even if you were to apply it, it provides them no relief. But the simple answer is they agreed to have the bankruptcy court do it. And you can ask yourself rhetorically why they are so desperate not to have this go back to the judge who actually entered the provision as an order and knows the most about it. I think I know the answer to that. With respect to their other issues, as Your Honor pointed out, and to bring it back to the stuff that matters, CASB is the standard. And CASB says very clearly that damages are recoverable if they are, quote, not so remote as to make it unforeseeable to a reasonable man at the time of contracting. That's the standard. And that's not the standard the district court reinvented below. It's not the standard the court used. And that would be the standard to direct the jury even when this case were to go back to them. On the issue of whether they limited their liability by contract, they tried that argument three times. The two judges below heard everything he just said, got all of the evidence they proposed, and rejected it as a matter of law. Not because it was an issue of fact, but construing the facts they presented most favorable to them, the court found that they lost that issue. Two judges, three times. And it doesn't get any better with age. And I see my time is up. Thank you. Very well. Thank you, counsel. Court appreciates your appearance and argument. The case is submitted.